IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WISCONSIN LABORERS PENSION
FUND, et al.

                        Plaintiffs,                        OPINION AND ORDER

    v.

                                                             17-cv-901-wmc

THE BRISTOL GROUP, LLC,
METROSCAPES, LLC,

                        Defendants.

---

On September 12, 2018, this court granted partial default judgment in favor of plaintiffs, finding that The Bristol Group, LLC ("Bristol Group") failed to pay fringe benefit contributions on behalf of its employees. (Dkt. #28.) The court assessed damages against Bristol Group in the amount of $263,076.40 in favor of plaintiff Wisconsin Laborers Health Fund and $275,366.10 in favor of plaintiff Building Trades Union Pension Fund. (*Id.*) In the instant summary judgment motion, plaintiffs argue that defendant Metroscapes, LLC ("Metroscapes") is a successor to Bristol Group and should be held liable for the judgment already entered against Bristol Group. (Dkts. #48, 49.) Although initially responsive to discovery, Metroscapes has since failed to respond to plaintiffs' requests for admissions, introduce facts, or file briefing opposing plaintiffs' summary judgment motion. Although Metroscapes' failure to respond does not automatically result in a judgment in plaintiffs' favor, the court finds for the reasons discussed below that plaintiffs have proven that no genuine issue of fact exists and that they are entitled to judgment as a matter of law.

UNDISPUTED FACTS[1]

A. Parties and Procedural History

The plaintiffs in this action are four employee benefit plans -- namely, the Wisconsin Laborers Pension Fund; Wisconsin Laborers Health Fund; Wisconsin Laborers Apprenticeship and Training Fund; and Building & Public Works Laborers Vacation Fund (the "Funds") -- John J. Schmitt, a trustee and fiduciary of the Wisconsin Laborers' Health Fund; the Wisconsin Laborers District Council ("District Council"), a labor union; and the Wisconsin Laborers-Employers Cooperation and Education Trust Fund. Before ceasing operations, Bristol Group was a landscaping business.

On May 13, 2009, Bristol Group signed a Memorandum of Understanding with the District Council, agreeing to be bound by a collective bargaining agreement (the "CBA"). Under this agreement and subsequent agreements, Bristol Group agreed to pay fringe benefit contributions and submit working dues for each employee covered by the CBA. On November 28, 2017, plaintiffs filed suit against Bristol Group, alleging that it had failed to abide by the terms of the CBA in violation of the Labor-Management Relations Act, 29 U.S.C. § 141, *et seq.*, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.

After Bristol Group failed to plead or otherwise defend against this lawsuit, the clerk of courts entered default (dkt. #9), and this court subsequently granted default judgment

---

[1] The following facts are taken from plaintiffs' proposed findings of fact as material and undisputed in light of defendant Metroscapes' failure to oppose them, unless otherwise noted. Because Metroscapes also failed to respond to plaintiffs' requests for admission, those matters are deemed admitted for the purposes of this summary judgment motion as well. *See* Fed. R. Civ. P. 36(a)(3).

against Bristol Group on September 12, 2018 (dkt. #28). In its decision, the court assessed damages against Bristol Group in the amount of $263,076.40 in favor of plaintiff Wisconsin Laborers Health Fund and $275,366.10 in favor of plaintiff Building Trades Union Pension Fund. Meanwhile, plaintiffs amended their complaint to include Metroscapes as a defendant, alleging that it was a successor of Bristol Group. (Dkt. #17.)

### B. Facts Regarding Successor Liability

On January 15, 2018, Robert Moore, the owner and registered agent of Metroscapes, signed an Operating Agreement with Second Wind Consultants, LLC ("Second Wind"). Under this agreement, Second Wind obtained a 1% interest in and became a manager of Metroscapes. The agreement provided that one of Second Wind's management responsibilities was to structure an asset acquisition deal between Bristol Group and Metroscapes, including ensuring that Metroscapes did not assume any unknown liabilities through the deal and communicating any potential liabilities to Metroscapes.

By January 15, 2018, Second Wind was aware that Bristol Group was a signatory to the CBA with the District Council and that plaintiffs were claiming that Bristol Group had failed to remit all required contributions to the funds. Further, Second Wind was aware at the time that VJS Construction Services, Inc. ("VJS") -- a general contractor on projects for which Bristol Group provided work -- was making payments directly to the Funds as a result of Bristol Group's failure to itself remit contributions due for the hours worked by its employees on said projects. On January 30, 2018, Bristol Group ceased operations.

On April 30, 2018, Metroscapes acquired the assets of the Bristol Group and began operations as a separate corporate entity. Metroscapes retained many of Bristol Group's management, salaried and hourly jobsite employees, and it performed the same type of landscaping work for many of the same customers as Bristol Group. In the acquisition, Metroscapes assumed the obligation to pay $297,000 to Byline Bank in exchange for the bank's release of liens it had taken on Bristol Group's assets. Previously, Byline Bank had notified Bristol Group in a Notice of Private UCC Sale of Collateral that it intended to sell the collateral for $297,000. Therefore, the amount paid by Metroscapes to Byline Bank to release the liens was the exact amount the bank had previously requested; Metroscapes is not aware of any facts suggesting that the $297,000 sales price took into account the possibility of successor liability.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts and draw all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Even where, as here, no opposition to the summary judgment motion has been filed, the movant still bears the initial burden of showing that summary judgment is warranted. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970).

In this case, plaintiffs argue that Metroscapes is a successor to Bristol Group and that this court should impose liability upon Metroscapes for the value of the judgment previously entered against Bristol Group. (Pls.' Br. (dkt. #49) at 12.) In general, the

federal common law rule provides that "where one company sells its assets to another company, the latter is not liable for the debts and liabilities of the seller." *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 845 (7th Cir. 2015). In some circumstances, however, courts have found the imposition of successor liability to be appropriate "after carefully balancing the need to vindicate important federal statutory policies with equitable considerations." *Id.*

In particular, "[s]uccessor liability extends throughout federal employment law to protect federal statutory policies from corporate artifice." *Indiana Elec. Workers Pension Benefit Fund v. ManWeb Servs., Inc.*, 884 F.3d 770, 776 (7th Cir. 2018). The Seventh Circuit has specifically held that successor liability may be imposed in actions seeking recovery of delinquent employee benefit plan contributions. *See Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990). However, liability may only be imposed on a successor entity where: "(1) the successor had notice of the claim before the acquisition; and (2) there was substantial continuity in the operation of the business before and after the sale." *Tsareff*, 794 F.3d at 845 (quoting *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995)) (internal quotations removed).

I. **Notice**

With regard to the notice requirement, plaintiffs contend that Metroscapes knew of Bristol Group's liability when it acquired Bristol Group's assets. Specifically, plaintiffs contend that the undisputed facts show Second Wind was aware by January 15, 2018, that plaintiffs were claiming that Bristol Group had failed to pay all fringe benefit contributions

5

as required by the CBA and also that VJS was making payments directly to the Funds due to Bristol Group's failure to remit contributions.[2] Plaintiffs contend further that Second Wind was an agent of Metroscapes by virtue of their Operating Agreement and, therefore, Second Wind's knowledge of Bristol Group's liability would be imputed to Metroscapes as well.

The court begins with plaintiffs' agency allegations. An agency relationship "results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Fed. Pants, Inc. v. Stocking*, 762 F.2d 561, 564 (7th Cir. 1985) (quoting Restatement (Second) Agency § 1(1) (1958)). Here, Metroscapes has not disputed that, "[p]ursuant to the Operating Agreement, if Second Wind learned of any liabilities of Bristol Group which Metroscapes had any risk of assuming by purchasing the assets of the Bristol Group, Second Wind was responsible for addressing such potential liabilities in structuring a transaction as a manager of Metroscapes, and to let Metroscapes know of the potential liability." (Pls.' PFOF (dkt. #52) ¶ 14.) This fact alone shows Metroscapes manifested consent for Second Wind to act on its behalf and subject to its control in assessing potential liabilities regarding the proposed Bristol Group acquisition, and Second Wind likewise consented to act in that capacity. As such, an agency relationship existed, at least for the limited purpose of assessing and communicating information about potential employee liability in structuring the Bristol Group transaction.

---

[2] Presumably, VJS was paying the Funds directly in lieu of paying all the money to Bristol Group because of its past failures to remit required payments to the Funds.

Moreover, if an agent has or gains knowledge of a fact that is material to the agent's duties to the principal, then notice of that fact is imputed to the principal. *BABB Real Estate LLC v. Bennett*, No. 10-CV-119-WMC, 2011 WL 13209349, at *4 (W.D. Wis. Mar. 17, 2011) (quoting Restatement (Third) of Agency § 5.03 (2006)). "Further, for knowledge to be imputed, the agent must have not just a duty in relation to the subject matter, but a duty to speak to his principal about the specific item of knowledge." *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992).

Here, it is undisputed that Second Wind was aware of information regarding Bristol Group's liability for unpaid benefit contributions, which was also clearly relevant to Second Wind's duty to communicate information to Metroscapes regarding potential liability in structuring the Bristol Group transaction. Although Second Wind acquired this information "by" January 15, 2018 -- the same date it entered into the Operating Agreement with Metroscapes and both parties manifested consent to create an agency relationship -- that the information may have been acquired *before* the formation of the agency relationship would not preclude imputing that knowledge onto the principal. *See Trustees of Chicago Plastering Inst. Pension Tr. v. Elite Plastering Co.*, 603 F. Supp. 2d 1143, 1149 (N.D. Ill. 2009) ("imputation is appropriate where an agent clearly knows material information that he has a duty to disclose, even if he learned that information before he started working on behalf of the principal").

The general knowledge Second Wind possessed regarding Bristol Group's potential liability also provided sufficient notice for purposes of successor liability, since the successor need not know the precise extent of the liability to be adequately noticed. *Tsareff*,

794 F.3d at 847; *see also EEOC v. Vucitech*, 842 F.2d 936, 945 (7th Cir. 1988) (imposing successor liability where successor, through its agent, knew or should have known about employment discrimination suits filed against predecessor). Further, notice may be actual or "implied from a variety of circumstances, such as common control or proximity." *Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 357 (7th Cir. 2014). Here, Second Wind -- and by imputation, Metroscapes -- knew that plaintiffs claimed Bristol Group was in arrears on fringe benefit contributions owed, and it further knew that VJS had begun making payments directly to the Funds due to Bristol Group's failure to remit contributions. Additionally, Metroscapes retained many of Bristol Group's former management employees, who would have been aware of its ongoing liabilities. This undisputed evidence is sufficient to show that Metroscapes had adequate notice of Bristol Group's liability before acquiring its assets.

## II. Continuity

In addition to notice, substantial continuity between the purported predecessor and successor must be established in order for successor liability to apply. *Artistic Furniture of Pontiac*, 920 F.2d at 1329. Factors considered in determining whether substantial continuity exists include: "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 43 (1987). Nearly all of these factors are present here. On April 30, 2018, Metroscapes acquired the assets

of Bristol Group and began operating as a corporate entity separate from Bristol Group that same day. Metroscapes retained and employed many of Bristol Group's former management, as well as salaried and hourly jobsite employees, and it continued to perform the same times of landscaping work for many of the same customers that Bristol Group had performed. Therefore, the court concludes that substantial continuity exists between Bristol Group and Metroscapes as well.

**III. Other Equitable Factors**

Finally, successor liability is an equitable doctrine, and as such courts may in some circumstances decline to impose liability onto a potential successor if the result would be inequitable. *See Tasemkin*, 59 F.3d at 49 (observing that "[s]uccessor liability is an equitable doctrine" and that "in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate") (quoting *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 256 (1974)). Given Metroscapes' failure to participate in this litigation further, and in particular failure to respond to plaintiffs' summary judgment briefing and proposed findings of fact, there are *no* other facts in the (admittedly limited) record suggesting that the imposition of liability in this case would be inequitable.

Plaintiffs cite to *Teed v. Thomas & Betts Power Sols., LLC*, 711 F.3d 763 (7th Cir. 2013), for the proposition that "there would be good reason not to impose successor liability in situations in which a buyer pays less to purchase assets because of the threat of successor liability." (Pls.' Br. (dkt. #49) 10.) But that is not quite right. What *Teed*

actually suggested is that, where an insolvent successor defaults and its assets are sold in bankruptcy or outside (for example, by a receiver), that might be a good reason not to apply successor liability. *Teed*, 711 F.3d at 768. The court reasoned that in such a case, the successor would discount its bid at the auction for the predecessor if it knew successor liability would be imposed, thus giving less money to the bank and in effect prioritizing the workers' unsecured claims over the secured claims of the bank. *Id.* However, the *Teed* court went on to note that in the case before it, even though the predecessor was in default, there was no evidence that the successor had discounted its bid to account for potential successor liability, and therefore there was no issue with claims prioritization. *Id.* Here, as in *Teed*, Bristol Group was in default; but also as in *Teed*, there is no evidence that Metroscapes discounted its purchase of Bristol Group to account for potential liabilities. In fact, as plaintiffs point out, Metroscapes purchased Bristol Group's assets for the exact value that Byline Bank, Bristol Group's secured creditor, was seeking in protection of its interests, suggesting that imposing liability in this case would not improperly prioritize plaintiffs' unsecured claims over Byline Bank's secured ones.

In sum, the court concludes plaintiffs have demonstrated on the undisputed record that they are entitled to summary judgment as a matter of law. In particular, plaintiffs have proven that defendant Metroscapes is a successor corporation to Bristol Group and, accordingly, that the judgment this court previously entered against Bristol Group is appropriately imputed to Metroscapes.

ORDER

IT IS ORDERED that:

1) Plaintiffs' motion for summary judgment (dkt. #48) is GRANTED;

2) Consistent with the opinion above, the court assesses the total damages against defendant Metroscapes, LLC, joint and several with Bristol Group, as follows:

   a. in favor of plaintiff Wisconsin Laborers Health Fund in the amount of $263,076.40; and

   b. as required by defendant The Bristol Group, LLC's collective bargaining agreement, in favor of Building Trades United Pension Fund on behalf of the other plaintiffs in the amount of $275,366.10.

Entered this 9th day of January, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge